## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |
|---|---|
| MIRANDA WEBB,<br><br>Plaintiff,<br><br>vs.<br><br>DREXEL UNIVERSITY,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>) CIVIL ACTION NO. _____<br>)<br>)<br>)<br>)<br>)<br>) |

## COMPLAINT

Plaintiff Miranda Webb, brings this civil action under Federal law and the laws of the Commonwealth of Pennsylvania, seeking compensatory damages against Defendant Drexel University for offenses arising from, *inter alia*, Defendant's breach of contract and violations of Title IX of the Education Amendments of 1972 ("Title IX"), 20 U.S.C. §1681, *et seq.*

## JURISDICTION AND VENUE

1. This court has subject matter jurisdiction over the Title IX claim in this case pursuant to 28 U.S.C. § 1331, as those claims arise under the laws of the United States. *See* 20 U.S.C. § 1681, *et seq.*

2. This Court has supplemental jurisdiction over the Pennsylvania law claims in this case pursuant to 28 U.S.C. § 1367 because those claims are so related to the claims that are within this Court's original jurisdiction that they form part of the same case or controversy.

3. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims set forth herein occurred within the jurisdiction of this Court.

## PARTIES

4. Plaintiff Miranda Webb ("Miranda" or "Ms. Webb"), is a nursing student at Drexel University.  She resides at 828 Greenwood Avenue, Jenkintown, PA 19046.

1

5. Defendant Drexel University ("Drexel" or "The University") is a private college with its main campus and principal place of business located at 3141 Chestnut Street, Philadelphia, PA 19104.

6. At all times material hereto, Defendant acted by and through its agents, servants, employees, and/or representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of Defendant' business, mission and/or affairs.

## FACTUAL BACKGROUND

7. Ms. Webb is a student in the Accelerated Career Entry Program ("ACE Program") of the College of Nursing and Health Professions ("College of Nursing") at Drexel University.

8. In or about May 2017, Drexel accepted Ms. Webb as a student in its College of Nursing ACE Program.

9. The ACE Program is an intensive 11-month course of study consisting of four approximately 11-week quarters.

10. The ACE Program includes clinical education and classroom instruction.

11. Students in the ACE Program must complete nine clinical rotations in order to graduate. Clinics are graded as pass or fail.

12. Upon completion of the requisite coursework and clinicals, Drexel confers on students in the ACE Program Bachelor of Science in Nursing degrees.

13. In the summer of 2017, Ms. Webb decided to attend Drexel's ACE Program, completed the required matriculation materials, and paid her tuition. In so doing, she accepted Drexel's offer of admission and a contract—embodied in Defendant's admissions agreement, policies, procedures, guidelines, and handbooks—was created between Plaintiff and Defendant.

14. Ms. Webb entered the ACE Program in Fall of 2017.

15. For the first two quarters in the ACE Program, Ms. Webb earned Dean's List recognition.

**Ms. Webb's Unanticipated Medical Leave of Absence**

16. On April 6, 2018, while at her first day in clinical orientation in Labor and Delivery at Hahnemann Hospital, Miranda began to experience symptoms of vertigo and nausea. Miranda alerted the clinical professor that she felt sick and asked to be excused to go to the restroom. While in the restroom, Miranda's symptoms worsened. She vomited. Feeling unwell, unnerved by her sudden onset of new symptoms, and that it was best that she not be violently ill while in a neonatal intensive care unit, Miranda decided to go get medical care.

17. Miranda texted a fellow clinical student stating that she was unwell and asked her classmate to alert their clinical professor that Miranda was sick and had gone to get medical attention.

18. Miranda's classmate texted her back. He stated that he had informed their professor that Miranda was ill and left to seek medical treatment.

19. Sometime thereafter, the clinical professor texted Miranda to inquire how Miranda was doing. The professor did not indicate that she felt that Miranda had mishandled her sudden illness on April 6, 2018.

20. Miranda received a full examination by an internist on April 10, 2018. Per the doctor's order, Miranda received a brain MRI later that same day.

21. The doctor could not provide a diagnosis and suggested that Miranda schedule an evaluation with an otolaryngologist. As it would turn out, this was not an acute illness, but a chronic one: Lyme disease.

22. Miranda's debilitating symptoms persisted. Some days her symptoms were so bad that she was forced to miss clinicals and/or class.

23. Due to the severity of the symptoms, Miranda reached out to Dr. Trinkaus, former chair of the ACE Program, to schedule a meeting. Miranda wanted to inform Dr. Trinkaus about the medical issue she was dealing with, discuss her then-unexplained symptoms, and explore what options were available to her in the ACE program.

24. Miranda was then contacted by Dr. Trinkaus' secretary and informed that Dr. Trinkaus wanted to meet with Miranda on April 13, 2018.

25. At the meeting on April 13, 2018, Dr. Trinkaus was joined by Professor Gonzalez and Professor Ricci. Miranda was shown a complaint from Professor Fadeyibi, the Labor and Delivery Clinical Professor, alleging Miranda had left her clinical without providing notice to the professor. Professor Fadeyibi did not attend this meeting.

26. Miranda explained the attempts she made to notify Professor Fadeyibi that she was ill on April 6, 2018, and the fact that Miranda had no reason to believe that Professor Fadeyibi was unaware that Miranda left the clinical due to illness.

27. Professor Ritchie told Miranda, "I do not buy your story."

28. Miranda was asked why, despite the fact she was vomiting, she did not return to the Labor and Delivery floor, enter the neonatal intensive care unit while nauseous, and personally inform Professor Fadeyibi that she was sick and would have to leave the building.

3

29. Miranda was told that her actions were "mind boggling" violations of the code of conduct for nursing students and was accused of "abandoning her post."

30. Miranda left that meeting with the clear understanding that she was going to receive an "F" in the labor and delivery course and clinical; that she was not permitted to go to that class or clinical; that she would not be able to graduate on time; and that her status as a student could be in jeopardy.

31. Miranda was told that the matter would go to the Conduct Committee which would make the final decision about whether she could remain in the program.

32. Drexel provided Miranda with no information about the composition of the Committee, when the matter would go before the Committee, or what opportunity she would have to advocate on her own behalf. Nor did it provide Miranda with a copy of a complaint or the specific allegations levied against her.

33. Miranda sent emails requesting information about the Conduct Committee. Her emails went unanswered.

34. For reasons that remain unknown to Miranda to this day, Drexel never sent Miranda sent to the Conduct Committee and took no further disciplinary actions against her for the manifestations of her Lyme disease.

35. The severity of Miranda's medical condition required her to request a medical leave of absence from the ACE Program from April 2018 through September 2018. Drexel granted that request because Miranda had demonstrated, and Drexel agreed, that her medical condition justified a leave.

36. Miranda retuned to Drexel and the ACE Program in September 2018. She anticipated graduating from the ACE Program in March 2019.

**Flushing of the Line and Drexel's Response Before Miranda's Title IX Grievance**

37. Following her return to the program, Miranda continued to earn high marks in her didactic classes. She also returned to her clinical rotations.

38. On November 1, 2018, in Miranda's pediatric clinical, Miranda was working with a nurse at Children's Hospital of Philadelphia ("CHOP"). Her duties included various tasks, including flushing IV lines with normal saline under supervision.

39. Miranda had previously learned about flushing IV lines extensively in the classroom and practiced on a regular basis during clinicals.

40. The supervising nurse instructed Miranda to check on a 15-year-old patient.

41. The adolescent patient expressed concern that her IV may be clogged. Miranda asked the patient if she was experiencing pain with her IV; the patient said no. Miranda assessed

the IV line for signs of infection or comprise to the integrity of the line. Miranda observed and relayed to the patient that the IV appeared intact.

42.    The adolescent patient expressed that it would make her feel better if Miranda checked to see if the IV line was clogged. At the patient's request and with the consent of the patient's mother, Miranda conducted a flush of the patient's IV.[1]

43.    Miranda immediately reported the flush to the supervising nurse. The nurse thanked Miranda and mentioned that this patient routinely requests her IV to be flushed.

44.    Later that day, the pediatric clinical professor from Drexel informed Miranda that she should not have administered the flush without supervision, but that it was not a major issue, that Miranda was "not in any trouble," and she would be issued only a Clinical Communication.

45.    Ms. Webb did in fact receive the Clinical Communication wherein it cites the "[p]lan for remediation" as: "Miranda will not perform invasive procedures in the clinical setting unless the RN or the clinical instructor is present and able to guide her through the process."

46.    In the Clinical Communication, the professor is required to answer the question "[i]s the student being referred to remediation in order to resolve the deficiency?" The professor responded "No."

47.    The ACE Program Student Handbook states that "[w]hen an incident occurs which a faculty member believes may constitute an unsafe practice, the faculty member *will* immediately instruct the student to leave the clinical setting. The faculty member *will* also immediately notify the course chair." *Drexel University College of Nursing & Health Programs, Accelerated Career Entry, Student Handbook ("ACE Student Handbook")*, Section VIII Clinical/Practicum Guidelines, Policy M(4) (emphases added).

48.    CHOP did not take any action to bar Miranda from her pediatric clinical.

49.    Drexel did not instruct Miranda to leave the clinical setting. It permitted her to continue to treat pediatric patients during subsequent pediatric clinical sessions.

50.    Given the mandatory language in the Student Handbook that students *will* be immediately removed from the clinical setting for "unsafe practice," the fact that Miranda was not immediately removed from her pediatric clinical, the fact that Miranda was permitted to care for pediatric patients during subsequent clinical sessions, and the explicit assurances of her clinical professor that Miranda was "not in any trouble," Miranda reasonably believed that her behavior did not constitute "unsafe practice" and the clinical communication would be the extent of the consequences.

---

[1] Ms. Webb pushed approximately 3-4mls of 0.9% normal saline solution into the IV line. At no point did Ms. Webb administer medication of any kind.

5

**Ms. Webb's Title IX Grievance**

51.  David A. Bullen, an adjunct professor at Drexel University's College of Nursing, taught one of Miranda's clinical courses in the Fall of 2018.

52.  During his time as Ms. Webb's clinical instructor, Professor Bullen made unwelcome and repeated comments regarding Miranda's weight, body type, and appearance. He also repeatedly rated Miranda poorly, then used the poor ratings he had created to suggest that she improve her performance by working one-on-one with him outside of regular hours.

53.  The sexual harassment by Professor Bullen towards Ms. Webb was not limited to a one-time incident. It was ongoing throughout his supervision of Miranda.

54.  In addition to his direct harassment of Miranda, Professor Bullen also made inappropriate comments about female patients' body types and appearance in front of students.

55.  Ms. Webb shared details about the ongoing sexual harassment via email with a Drexel professor.

56.  On November 1, 2018, that professor responded to an email from Ms. Webb expressing "significant concern," provided information about making a Title IX report, and informed Ms. Webb that as a mandatory reporter, she was copying Dr. Deanna Schaffer, the chair of the ACE Program, on her response.

57.  On November 6, 2018, Ms. Webb met with that same professor regarding the sexual harassment she was subjected to by David A. Bullen.

58.  After this meeting, Ms. Webb decided to file a Title IX grievance against Professor Bullen as recourse to the sexual harassment she endured. She submitted that grievance to Drexel.

**Drexel's Retaliation in Response to Ms. Webb's Title IX Grievance**

59.  Three days later, Ms. Webb received an email from Dr. Schaffer, demanding a meeting on November 12, 2018, to discuss Miranda's progression in the ACE Program and the Clinical Communication she received from the pediatric clinical professor regarding the IV flush.

60.  On November 12, 2018, Miranda met with Dr. Schaffer. In this meeting, Dr. Schaffer conveyed that Miranda's purported patient safety violation was egregious.[2] Dr. Schaffer cited several other alleged conduct violations that Dr. Schaffer had, prior to the Title IX

---

[2] On December 24, 2018, Drexel provided Ms. Webb with a copy of CHOP's Department of Nursing Student Nursing Responsibilities. It states "[s]pecfic nursing practices that students are NOT allowed to carry out include: starting IVs, administering blood, giving IV push medications, accepting verbal orders, modifying orders, signing off orders or administering some medications . . . ." The policy does not mention, nor explicitly bar, flushing IVs with saline solution.

grievance, declined to send to the Conduct Committee. Dr. Schaffer even brought up the "incident" in Spring 2018 when Miranda left the Labor and Delivery clinical because she was suffering from the onset of an illness that resulted in a five-month-long, Drexel-approved, medical leave of absence.

61. On November 13, 2018, Miranda received notice that she was banned from her three clinicals. There were only two weeks left in the quarter.

62. Drexel cited "safety" as the reason Miranda was no longer permitted to attend any clinicals.

63. On November 18, 2018, Miranda received a letter from Drexel stating that as a result of "violations of various ACE Program policies," Dr. Schaffer was making a recommendation to the Student Conduct Committee that Miranda be dismissed from the ACE Program.

64. Prior to the Title IX grievance, Dr. Schaffer decided that various complaints against Ms. Webb were not worth consideration by the Conduct Committee. After the Title IX grievance, however, she suddenly decided *all* of them were worth submission to the Committee.

65. Similarly, prior to Ms. Webb's Title IX grievance, Drexel saw Ms. Webb's flushing of a fifteen year-old patient's IV as, at most, a minor mistake that required only identification of the issue and constructive feedback—which is exactly what originally occurred.

66. Upon information or belief, after Ms. Webb reported the IV flush, the supervising nurse and/or CHOP staff did not immediately (or anytime thereafter) check the patient for an adverse reaction to the IV flush, order tests, require the patient's vital signs to be monitored, or inform the physician on duty, as would be normal procedure of any hospital for an event representing serious risk.

67. Upon information or belief, neither Dr. Shaffer nor any other representative of CHOP or Drexel reported the IV flush incident to the Pennsylvania Patient Safety Reporting System, as they ordinarily would in the event of a clinical "near miss." *See* 40 P.S. §§ 1303.308; 1303.313.

68. Upon information or belief, the IV flush incident was not reported to CHOP's Office of Clinical Quality Improvement, the Office of Safety and Medical Operations, or the Office of Patient Safety and Quality as the serious patient safety risk that Drexel began claiming it to be after Ms. Webb's Title IX grievance.

69. On January 7, 2019, Ms. Webb's fourth quarter commenced. Ms. Webb was permitted to enroll in and begin classroom courses. Drexel continued to bar her from her final three clinicals that it requires for graduation.

7

70.    On January 3, 2019, Drexel informed Ms. Webb that if the Title IX grievance results in no finding against Professor Bullen, she will be dismissed from the program.

## CLAIMS

## COUNT I: VIOLATION OF TITLE IX

71.    Plaintiff incorporates the allegations contained in paragraphs 1 through 70, above, as if set forth fully herein.

72.    Title IX of the Education Amendments of 1972 states that no person "shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. §1681(a); *See also* 45 C.F.R. §1681 et. seq.  The Supreme Court has concluded that "sexual harassment is a form of discrimination for Title IX purposes. . . ." *Davis v. Monroe County Bd. Of Educ.*, 526 U.S. 629, 649-650 (1999) *see Gebser v. Lago Vista Independent School Dist.*, 524 U.S. 274, 281 (1998).

73.    "[W]hen a funding recipient retaliates against a person because he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX." *Jackson v. Birmingham Bd. Of Educ.*, 544 U.S. 167, 174 (2005).

74.    Ms. Webb endured repeated incidents of sexual harassment at the hands of clinical Professor David Bullen.

75.    Mr. Bullen made similar harassing comments about female patients.  Ms. Webb made Drexel administration aware that both she and female patients have been the victim of Mr. Bullen's sexual harassment and discrimination.

76.    Ms. Webb notified Drexel administrators of the sexual harassment, filed a Title IX grievance, and requested that Professor Bullen refrain from contacting her.  Days later, Ms. Webb was barred from attending her clinicals.

77.    In an attempt to justify their retaliatory behavior, Drexel cited "patient safety" concerns arising from the IV flush as the reason Ms. Webb was banned from clinicals.  Drexel did so despite the fact that for the twelve days before Ms. Webb's Title IX grievance, it had not seen any need to invoke its own patient safety policies and procedures.

78.    Similarly, in a further attempt to justify their retaliatory recommendation that Ms. Webb be dismissed from the ACE program, Drexel points to minor incidents that occurred, and were dealt with, weeks to months prior to Ms. Webb's initiation of a Title IX grievance. These reasons are plainly pretextual.  At the time each incident occurred, they were considered minor infractions at most that warranted, at most, only a clinical communication.  After Ms. Webb filed her Title IX grievance, Drexel insisted these same minor infractions warranted dismissal from the ACE Program.

8

79. In *Jackson v. Birmingham Bd. Of Educ.*, the Supreme Court held that "Title IX's private right of action encompasses suits for retaliation, because retaliation falls within the statute's prohibition of intentional discrimination on the basis of sex." *Id.* at 178. "It is a form of 'discrimination' because the complainant is being subjected to different treatment." *Id.* at 174. The Court explained, "if retaliation were not prohibited, Title IX's enforcement scheme would unravel." *Id.* at 180

80. Drexel is preventing Ms. Webb from continuing her education not to protect patients, but to punish Ms. Webb for bringing Professor Bullen's disturbing comments and behaviors towards Ms. Webb and female patients to light.

81. Title IX retaliation claims extend to those who are victims of sex discrimination and those who oppose discrimination against others. *Id.* at 179-180. *See Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (holding that a person may bring suit under 42 U.S.C. §1982 if she can show she was "punished for trying to vindicate the rights of minorities.")

82. Drexel's retaliatory actions will significantly delay and/or prevent Ms. Webb's progression towards graduation and beginning her career.

**WHEREFORE**, Plaintiff requests the following relief:

a. Find that Defendant has unlawfully retaliated against Plaintiff for filing a Title IX grievance;

b. Permanently enjoin Defendant from engaging in further retaliatory actions;

c. Require Defendant to implement adequate policies, procedures, and training to prevent the sexual harassment of students in the ACE program and ensure Drexel's compliance with Title IX;

d. Award compensatory damages for the emotional distress, mental anguish, and reputational harm Ms. Webb suffered as a result of Defendants' unlawful retaliation under Title IX, in an amount to be proven at trial;

e. Order Drexel to expunge this incident from Ms. Webb's disciplinary record;

f. Award Plaintiff reasonable attorney's fees pursuant to 42 U.S.C. § 1988;

g. Award punitive damages sufficient to deter Defendants from pursuing similar retaliatory actions in the future; and

h. Grant such other relief as the Court may deem appropriate.

## COUNT II: BREACH OF CONTRACT

83.    Plaintiff incorporates the allegations contained in paragraphs 1 through 82, above, as if set forth fully herein.

84.    Plaintiff and Defendant are parties to a contract. *See Swartley v. Hoffner,* 734 A.2d 915, 919 (Pa. Super. Ct. 1999) ("[T]he relationship between a private educational institution and an enrolled student is contractual in nature; therefore, a student can bring a cause of action against said institution for breach of contract where the institution ignores or violates portions of the written contract.").

85.    In the ACE Student Handbook, under "Student Complaint/Grievances/Appeal Process, it states:

> The University/College is to fulfill its promise to students to provide high quality academic, useful, and ethically-based professional preparation in a specific field of study/practice. Furthermore, the University/College aims to support students in having a "good experience" at Drexel University. It is important that the University/College have in place a Student Complaint/Grievance/Appeal Process. Fundamental and important precepts include:
>
> - Students have an avenue for communicating a concern.
> - Students receive due process for any transgression.
> - Students receive fair treatment, without bias, in any review.
> - Student issues are reviewed with care and in a timely manner.
> - Students receive communication explaining the rationale for decisions made by faculty and administration regarding an issue.
> - Faculty and Administration are open to suggestions for quality improvement of any policy, procedure, or practice.
>
> The initial approach that the University/College takes toward student complaints/grievances is that before a student seeks recourse, he/she should first exhaust the immediate means of resolution between the parties involved. Typically this occurs between faculty and student.

*Id.,* Section VII Prelicensure Program Policies, Policy O.

86.    Ms. Webb filed a Title IX grievance. Since the filing of this grievance, Drexel has failed to treat Ms. Webb fairly and without bias. It has stated to her that her filing of a Title IX grievance could, if Drexel, in its sole discretion, decides to find that Professor Bullen did

10

not harass her, itself be cause for her dismissal. Their actions since the filing of the grievance have been punitive and retaliatory.

87.    In addition, Drexel's policy that promises review and resolution of "[s]tudent issues . . . with care and in a timely manner," guarantees review and resolution in a "timely manner." Dr. Schaffer's attempt to *now* dismiss Ms. Webb for incidents and issues that occurred weeks and months prior demonstrates a breach of contract.

**WHEREFORE**, Plaintiff requests the following relief:

(a)    Granting judgment for the Plaintiff and against Defendant;

(b)    Ordering Defendant to specifically perform the parties' contract, permit Plaintiff to participate in clinicals, reimburse Plaintiff $25,436.00 in tuition for the lost value of being banned from clinical starting 13 November 2018;

(c)    Granting Plaintiff her expenses, including reasonable attorney fees and costs incurred in connection with this action;

(d)    Granting Plaintiff interest at the statutory rate from 13 November 2018; and

(e)    Granting such other relief as the Court deems equitable and just.

Date:    15 January 2019

Respectfully submitted,

Michael D. Raffaele
Kershenbaum & Raffaele, LLC
1230 County Line Road
Bryn Mawr, PA 19010
(610) 922-4200
(610) 646-0888 [fax]
Michael@mykidslawyer.com

*Counsel for Plaintiff Miranda Webb*

11